UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 08-21467-CIV-MORENO/Turnoff

UNITED STATES OF AMERICA,

 Plaintiff,

v.

TRACT NO. 403-22
(EAST EVERGLADES)

10.0 ACRES OF LAND, MORE OR LESS,
SITUATED IN MIAMI-DADE COUNTY,
STATE OF FLORIDA; AND
MICHAEL JOHN BOOTH, *ET AL.*;
AND UNKNOWN OWNERS,

 Defendants.
_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the undersigned upon Plaintiff's Objections **[DE 55]** to the Report of Land Commissioners (the "Report") dated May 6, 2010. **[DE 54]**. A hearing on these matters was held before the undersigned on July 14, 2010. **[DE 59]**. Upon review of the Report, the written and oral arguments, the applicable law, and being otherwise duly advised in the premises, the undersigned makes the following findings.

### I. Background

On May 20, 2008, the Government filed a Complaint in Condemnation pursuant to a Declaration of Taking against Defendant property (hereinafter, the "subject property"), located in the East Everglades. **[DE 1]**. The single tract at issue in this proceeding, Tract No. 403-32, consists of 10.00 acres of land previously owned by Defendant Michael John Booth (hereinafter, the "Landowner"). A trial took place before the Land Commission (hereinafter, the "Commission"), on

CASE NO.: 08-21467-CIV-MORENO/Turnoff

December 3, 2009. **[DE 54]**.

On May 5, 2010, the Commission issued its findings as to fair market value and just compensation for the subject parcel, and awarded the Landowner a total sum of $ 750,000. Id. The United States filed its Objections to same on May 27, 2010, objecting to, *inter alia*, the Commission's conclusions of "highest and best use" and value for the subject property. **[DE 55]**.

## II. Standard of Review

The standard of review in considering the Report is *de novo*. Rule 53(f)(3) and (4) of the Federal Rules of Civil Procedure states that "the court must decide *de novo* all objections to findings of fact," unless the parties stipulate otherwise, and "must decide *de novo* all objections to conclusions of law," respectively. Fed. R. Civ. P. 53(f)(3) and (4). In 2003, Rule 53 was amended to provide that a special master's report would be reviewed *de novo*. See Summer v. Howard Univ., 374 F.3d 1188, n.6 (D.C. Cir. 2004). Rule 53 further requires a *de novo* review by an Article III judge; however, any intervening report by a Magistrate Judge will not impair the ability of the District Court to conduct the required *de novo* review. See Report of the Civil Rules Advisory Committee (May 20, 2002) at 45.

## III. The Witnesses

A total of five witnesses testified at trial. **[DE 54]**. Defendant presented three witnesses: (1) the Landowner; (2) L. Ross Morrell ("Morrell"), an archeologist and former Chief Archeologist for the State of Florida; and (3) D. Craig Keneipp ("Keneipp"), a Florida State Certified Real Estate Appraiser. Id. The Government called two witnesses: (1) Robert Johnson ("Johnson"), a National Park Service hydrologist who heads the South Florida Natural Resources Center at the Everglades

CASE NO.: 08-21467-CIV-MORENO/Turnoff

National Park; and (2) John Underwood ("Underwood"), an independent certified appraiser. Id.

## IV. Government's Comparable Sales Properties

The Government's expert appraiser, Underwood, determined the value of the subject property by locating comparable sales and adjusting the value to account for differences in physical characteristics and functional utility. Id. Underwood began the appraisal process by searching for comparable sales in the East Everglades area. Id. When he was unable to locate any, he expanded his search into the neighboring Big Cypress National Preserve. Id. There, he found one comparable improved property, but rejected it, because he believed it had been improved legally. He also believed the subject property was improved illegally.[1] Id.

Next, Underwood identified eight sales of vacant land in the East Everglades as comparable sales. Id. All of the selected comparable properties were periodically flooded, indistinguishable flat, rocky swampland that was sold between sixteen and twenty years before the 2008 taking of the subject property. Id. The Government introduced no evidence that the comparable properties were useful for passive recreation nor any evidence indicating the physical similarity or resemblance of these sales to the subject property. Id. From there, Underwood made no positive adjustments to account for differences in time, improvements, or "elements of value." Id. In fact, he believed the subject property to be accessible only by a dirt road, and thus adjusted the market price down. Id. Underwood opined that the fair market value of the subject property, as unimproved, was $ 1,800 per acre, or $ 18,000 total, plus an added value of $ 61,200 for the improvements. Id.

---

[1] In fact, both properties had been improved without permits. Underwood testified that he was not aware of this fact until hearing the testimony of the Landowner and the Landowner's expert appraiser, Keneipp, at trial.

CASE NO.: 08-21467-CIV-MORENO/Turnoff

The Land Commission, on the other hand, found that: (1) the selected comparable properties did not share physical similarities or the same functional utility with the subject property; (2) the comparable properties were not properly adjusted for the subject property's positive "elements of value;" (3) the positive adjustments should have been made due to the subject property's gravel road access; and (4) the selected comparable properties were sold for less than 50% of the average price of East Everglades vacant land in 1998. Id.

### V. The Landowner's Comparable Sales Properties

Like Underwood, the Landowner's expert appraiser, Keneipp, determined the value of the subject property by identifying comparable sales with similar physical characteristics and attributes, and adding value to account for the subject property's "elements of value." Id. Keneipp opined that the highest and best use of the subject property was a "recreational camp with improvements," and considered the following attributes as "elements of value:" (1) the land was improved with a rustic cabin; (2) 75% of the land was elevated and dry; (3) the land had a pond and hardwood tree hammock; (4) the land presented a good natural environment for nature study; (5) the property was a confirmed archeological site with artifacts and fossilized bones; (6) the land was secluded and remote, yet close to civilization; and (7) the land could be accessed year-round by a gravel road.

Initially, Keneipp searched for comparable sales in the East Everglades area and could not locate any. Id. Like Underwood, he then considered improved property sales in the Big Cypress National Preserve, located 100 miles away from the subject property. Id. Using a comparable sales approach, Keneipp identified four improved sales as comparable sales, each with the same highest and best use as the subject property:

CASE NO.: 08-21467-CIV-MORENO/Turnoff

A. 3.77 acres of land accessible by a gravel road that is periodically flooded. Improvements consisted of a frame cabin and mobile home built without a permit. In July 2007, the property sold for $ 66,313 per acre. Id.

B. 21.27 acres of land accessible only by a swamp buggy or light aircraft.[2] Improvements include a cabin with a generator structure, which was built without a permit, and an FAA-approved airstrip. In July 2007, the property sold for $ 103,432 per acre. Id.

C. 3 acres of land that periodically floods and has trees. Improvements consist of a travel trailer with a screened porch and electric and phone connections, all built without a permit. In March 2009, the property sold for $ 43,333 per acre. Id.

D. 2.21 acres of land that was paved, had an electric power connection, a mobile home, and a dilapidated garage, all built without a permit. Approximately 2/3 of the property is upland on a portion of a hardwood hammock, and the remainder is a pond. In May 2009, the property sold for $ 97,285 per acre. Id.

Keneipp identified sale "D" as the most similar to the subject property. Id. However, he noted that, unlike sale "D," the subject property was not located on a paved road and did not have an electric power connection. Id. On the other hand, the subject property had superior construction, cell phone service, a generator, a better natural environment for nature study, and confirmed artifacts. Id.

The sale prices for the four selected comparable sales ranged from $ 43,333 to $ 104,432 per acre; the mean price was $ 73,382 per acre; and the average price was $ 77,590 per acre. Keneipp adjusted these prices to account for the above-mentioned "elements of value," and concluded a fair market value of $ 75,000 per acre, or a total of $ 750,000 for the subject property. Id.

The Commission found that the Landowner met his burden of proof in rebutting the Government's assertion of value through the introduction of "far more credible evidence and

---

[2]This was the same sale Underwood initially identified as a potentially good comparable.

CASE NO.: 08-21467-CIV-MORENO/Turnoff

testimony," and agreed with Keneipp's findings of "highest and best use" (improved recreational campsite with cabin), adjustments for "elements of value," and the fair market value. Id.

## VI. Objections

The Government argues that the Landowner's selected comparable sales are not reliable because the sales took place in a different market area whose values had been increased by project influence. **[DE 55]**. The Government further argues that the attributes of the subject property that the Landowner characterizes as "elements of value" are, in fact, "desirable features," which should not have been taken into account. Id. Furthermore, the Government contends that the road leading to the property is not an "all weather road," but a road that is more comparable to a trail, which supports a negative adjustment to the fair market value. Id. Each argument shall be addressed below.

### 1.     Selection of Comparable Sales in the Big Cypress Area.

The Government argues that the comparable sales identified by Keneipp are not reliable comparable sales because they are located over 100 miles away from the subject property and are in a completely distinct, separate market. Id. At trial, Underwood testified that the Big Cypress properties are "carve-outs," which remain the sole privately owned parcels in an otherwise government-owned park, and thus, have an increased value. Id. He further explained that there is a difference in land value between properties in the East Everglades and in Big Cypress. For example, the East Everglades Zoning Overlay Ordinance in 1981 (hereinafter, the "33B Overlay Ordinance," or "33B") does not permit improvements on land in the East Everglades consisting of forty acres which has decreased the land's value. On the other hand, the "carve-out" properties in Big Cypress have a specific market and demand. Id. Additionally, the Government argues that Keneipp

CASE NO.: 08-21467-CIV-MORENO/Turnoff

erroneously equated the Big Cypress properties to the subject property, which was just one parcel among thousands available for private purchase. Id.

This Court is not persuaded. There were no private sales of improved recreational campsites in the East Everglades at any time in recent years, and as a result, both expert appraisers went to Big Cypress to locate comparable sales. Underwood testified that he, in fact, did find one potential property in Big Cypress but rejected it because he mistakenly believed that the improvements on the Big Cypress properties could remain, while the East Everglades properties were barred from development by 33B. **[DE 56]**. The Landowner testified that his rustic cabin did not need a building permit, had been approved by the permitting authorities, and could remain under 33B. **[DE 54]**. Keneipp testified that none of the comparable Big Cypress properties that he selected were built with permits. Id. Following this testimony, Underwood acknowledged that his previous reasoning was flawed, and testified that he did not use the Big Cypress properties because they were "carve-outs," which increased the underlying land value. Id.

The Landowner properly argues that, not only did 33B have no negative effect on the subject property, it may have actually increased the value due to the fact that the improvements were allowed to remain, while any development of surrounding unimproved property was prohibited. Id. Keneipp explained that, because the subject property was an improved recreational campsite that was remote and isolated, yet close to civilization, it indicated a value at the upper end of values for the Big Cypress properties. Id. The Government agrees. Consistent with the above, this Court finds that Underwood's reliance on the alleged effect of 33B on the subject property to distinguish it from the Big Cypress properties was improper, and approves of the Landowner's selection of comparable

CASE NO.: 08-21467-CIV-MORENO/Turnoff

sales.

### 2. Elements of Value.

The Government argues that Keneipp failed to recognize the distinction between an "element of value" and a feature that is merely "desirable." **[DE 58]**. According to the Government, an "element of value" actually adds value to the property while a "desirable feature" may attract a certain buyer, but does not add a quantifiable element of value. Id. The Government contends that Keneipp treated many "desirable features," such as the existence of artifacts, for example, as adding value without offering supporting evidence. Id.

This Court disagrees. The physical characteristics and attributes of the subject property not only distinguish it from Underwood's vacant swampland comparable sales, but unquestionably adds value. The undersigned is not persuaded by the Government's argument that all of the attributes distinguishing the subject property from nearby swampland are merely "desirable features" that do not add any value. The distinction between an attribute that is "merely desirable" and one that is an "element of value," as applied by the Government, is arbitrary.

The Commission found that the following attributes and/or physical characteristics of the subject property are positive "elements of value," raising the fair market value:

1. The <u>topography and elevation</u>, which is made up of a 7.5-acre "high and dry" hardwood tree hammock, with the remaining acreage consisting of a deepwater pond. Because hardwood trees will not grow or survive if they are in water for any length of time, their existence is an indication of "high and dry" land. **[DE 54]**.

2. The <u>hardwood tree hammock</u>, which ranks among the most unusual biotic communities,

CASE NO.: 08-21467-CIV-MORENO/Turnoff

is made up of trees including Gumbo Limbo, Pigeon Plum, Strangler Fig, Red Bay, and White Stopper, and is home to a multiple variety of birds. Furthermore, numerous animals are known to seek shelter and food in the hammock. Id.

      3. The pond was deepened in the 1970's and has water twelve months a year, providing for year-round fishing and nature observation. The pond is home to numerous species of animals, and has a wooden observation structure and a coral rock wall that the Landowner installed several years ago. Id.

      4. The rustic cabin is approximately 500 square feet and has a 2000+ square foot sundeck and observation tower. The foundation is 2500 square feet and is made of concrete. In 1991, Hurricane Andrew blew down the cabin, and the Landowner reconstructed it thereafter. Permits were not necessary so long as the cabin never installed fixed indoor plumbing or electrical wiring. The Landowner resided in the cabin seasonably from 1979 - 2008.

      5. The Landowner utilized the property for recreation by canoeing, fishing, hiking, bird-watching, etc. He frequently hosted many visitors– sometimes, as many as thirty at one time. He also hosted elementary school classes and farmed organic vegetables for personal consumption and for use at his church. Noting these factors, the Commission found that the subject property was an attractive and popular location for passive recreational activities, and considered this to be a positive "element of value." Id.

      6. Many artifacts were found on the property, including Tequesta Indian artifacts dating back 5,000 years; Spanish explorer artifacts dating back 500 years; and fossilized Pleistocene era bones dating back millions of years. Over the years, various archeologists have visited and performed

CASE NO.: 08-21467-CIV-MORENO/Turnoff

limited excavations on the subject property.

This Court agrees with the Commission that all of the above-mentioned attributes are positive "elements of value" to be taken into consideration when determining the fair market value. This Court further agrees with the Commission's rejection of Underwood's choice of comparable sales and conclusion as to value specifically. Underwood's selection of comparable properties was based only on location and size, and did not take into account any of the physical characteristics or attributes of the subject property. In sum, his decision to use vacant, flooded swamplands to determine the value of the subject property was improper.

   3.   **Access to the property**.

In its Report, the Commission considered the road leading to the property to be an "all weather" road, which is a positive "element of value." The Landowner testified that the main roadway was built by a developer and consisted of crushed gravel placed on top of the cap rock surface. **[DE 54]**. The Landowner hired a contractor to install the last portion of the crushed limestone road in the 1970's, which was raised above the existing ground level and in which culverts were installed. Id. Because of the elevation and culverts, the federal agencies found that the road did not interfere with water-flow and approved the extension. Id. Since then, trees common to dry land have sprouted and grown, eventually encroaching on either side of the raised roadbed. Id. This has caused an accumulation of leaves and debris over the last thirty years, resulting in a layer of dirt atop the crushed gravel. Id. In this connection, Underwood testified that he believed the road was actually a trail because it appeared to be a dirt road lined with trees. Id. Under this mistaken assumption, Underwood decreased the fair market value of the subject property by 30%, because properties with

CASE NO.: 08-21467-CIV-MORENO/Turnoff

dirt roads are worth less than those with gravel roads. Id.

The Government argues that the Commission should not have added value to the subject property because the road does not qualify as an "all weather" road. **[DE 55]**. "An 'all weather road' can be paved, or a pathway surface elevated above grade and covered with gravel or limestone, which can be used by a four-wheel drive vehicle 12 months of the year." **[DE 54]**. (Def. Ex. 42). The Government also argues that the area the Landowner raised was a depression that was below grade right before the hammock, and therefore, the road was merely raised to grade level, not *above* grade level. **[DE 58]**. However, the Landowner testified that the road is approximately three feet higher than the surrounding land, which is why the trees were able to grow. **[DE 56]**. Further, according to all witnesses, the property is accessible year-round by a four-wheel drive truck, except on two occasions when the water level was a foot-and-a-half in connection with hurricanes. Id.

Upon review of the record in this case, the Court finds that the evidence supports the finding that the subject property was accessible by a gravel, "all weather road." It is undisputed that the property was almost always accessible by a four-wheel drive truck. Furthermore, the existence of mature trees on the roadway supports the fact that the road was elevated above the water level most of the time. Additionally, the existence of culverts in the road further supports a finding that the road was raised above the land around it.

## VII. Conclusion

Consistent with the above and foregoing, it is hereby **RESPECTFULLY RECOMMENDED** that the United States' Objections **[DE 55]** be **DENIED**. It is further **RESPECTFULLY RECOMMENDED** that the Report of Land Commissioners **[DE 54]** be

CASE NO.: 08-21467-CIV-MORENO/Turnoff

**AFFIRMED**.

Pursuant to S.D. Fla. Magistrate Rule 4(b), the parties may serve and file written objections with the Honorable Federico A. Moreno, Chief United States District Judge, within fourteen (14) days of being served with a copy of this Report and Recommendation. Failure to file timely objections shall bar the parties from attacking on appeal any factual findings contained herein. RTC v. Hallmark Builders, Inc., 996 F. 2d 1144 (11th Cir. 1993); LoConte v. Dugger, 847 F. 2d 745 (11th Cir. 1988).

**DONE AND ORDERED** in Chambers at Miami, Florida, this 3rd day of September 2010.

_____
**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc:    Hon. Federico A. Moreno, Chief U.S. District Judge
       Counsel of Record